# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                               Plaintiff,<br>    v.<br>KEVIN UGURIT FIERRO-<br>MORALES (1), ALEX NAZARIO-<br>RAMIREZ (2),<br><br>                             Defendants. | CASE NO. 17CR3096 WQH<br><br>ORDER |

HAYES, Judge:

      The following motions filed by Defendant Kevin Ugurit Fierro-Morales are before the Court: 1) the motion to dismiss Count 2, preclude proceeding under an aiding and abetting theory, and for a bill of particulars[1] (ECF No. 53); 2) the motion to compel discovery and suppress gunshot residue (ECF No. 54); 3) the motion to dismiss Count 2 for violation of the Second Amendment (ECF No. 56); and 4) the motion to sever counts and discovery (ECF No. 68).

## BACKGROUND

      On September 29, 2017, the grand jury returned an indictment charging in Count 1 that Defendant Kevin Ugurit Fierro-Morales and Defendant Alex Nazario-Ramirez knowingly possessed a short-barreled shotgun not registered to them in violation of 26

---

[1] Co-defendant Alex Nazario-Ramirez moves the Court to join the motion for a bill of particulars, the motion to suppress gunshot residue, and the motion to preclude the prosecution from proceeding under an aiding and abetting theory. (ECF Nos. 59, 91).

U.S.C. §§ 5861(d) and 5871 and 18 U.S.C. § 2; and in Count 2 that Defendant Kevin Ugurit Fierro-Morales, "an alien who was illegally in the United States," knowingly possessed a short-barreled shotgun in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2). (ECF No. 19).

## ANALYSIS

**1) Motion to dismiss Count 2, preclude proceeding under an aiding and abetting theory, and for a bill of particulars (ECF No. 53)**

**A. Motion to dismiss Count 2 (ECF No. 53-1)**

Defendant Fierro-Morales moves to dismiss the charge that he is an alien illegally in the United States who knowingly possessed a firearm in violation of 18 U.S.C. § 922(g)(5)(A) and § 924(a)(2). Defendant asserts that the undisputed evidence demonstrates his possession of valid immigration status under the Deferred Action for Childhood Arrivals Program ("DACA") at the time of his arrest. Defendant asserts that a DACA recipient is not "illegally or unlawfully" present in the United States based upon the plain meaning of the words. In the alternative, Defendant asserts that Count 2 must be dismissed because § 922(g)(5)(A) is unconstitutionally void for vagueness as applied to a DACA recipient.

Plaintiff United States contends that Defendant, a DACA recipient, was protected from removal from the United States but remained illegally in the United States subject to the prohibition of § 922(g)(5)(A). Plaintiff United States contends that a DACA recipient has no legal status and remains illegally in the country. Plaintiff United States contends that the statutory language "illegally or unlawfully in the United States" in § 922(g)(5)(A) is not vague and remains enforceable against Defendant.

In *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957 (9th Cir. 2017), the Court of Appeals entered a preliminary injunction enjoining a policy of the Arizona Department of Transportation that "rejected the Employment Authorization Documents issued to DACA recipients under the DACA program as proof of authorized presence for the purpose of obtaining a driver's license." *Id*. at 963. The Court of Appeals

explained,

> On June 15, 2012, the Department of Homeland Security announced the DACA program pursuant to the DACA Memorandum. Under the DACA program, the Department of Homeland Security exercises its prosecutorial discretion not to seek removal of certain young immigrants. The DACA program allows these young immigrants, including members of ADAC, to remain in the United States for some period of time as long as they meet specified conditions.

> To qualify for the DACA program, immigrants must have come to the United States before the age of sixteen and must have been under the age of thirty-one by June 15, 2012. *See* Memorandum from Secretary Janet Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012). They must have been living in the United States at the time the DACA program was announced and must have continuously resided here for at least the previous five years. *Id.* Additionally, DACA-eligible immigrants must be enrolled in school, have graduated from high school, have obtained a General Educational Development certification, or have been honorably discharged from the U.S. Armed Forces or Coast Guard. *Id.* They must not pose a threat to public safety and must undergo extensive criminal background checks. *Id.*

> If granted deferred action under DACA, immigrants may remain in the United States for renewable two-year periods. DACA recipients enjoy no formal immigration status, but the Department of Homeland Security does not consider them to be unlawfully present in the United States and allows them to receive federal EADs.

*Id.* at 963-64.

Defendant Fierro-Morales submits a Form I-821D Consideration of Deferred Action for Childhood Arrivals which indicates "Approved by the Director Verified by NSC 07/02/2015." (ECF No. 53-2 at 3).[2] Defendant submits excepts from archived USCIS website regarding DACA Frequently Asked Questions which state in part:

> **Q5:If my case is deferred, am I in lawful status for the period of deferral?**
> A5: No. Although action on your case has been deferred and you do not accrue unlawful presence (for admissibility purposes) during the period of deferred action, deferred action does not confer any lawful status.

> The fact that you are not accruing unlawful presence does not change whether you are in lawful status while you remain in the United States. However, although deferred action does not confer a lawful immigration status, your period of stay is authorized by the Department of Homeland

---

[2] The Government states that "on October 23, 2017, USCIS mailed a termination notice to FIERRO, advising that the deferred action deferring FIERRO's removal from the United States and his employment authorization were terminated." (ECF No. 60 at 3).

17cr3096WQH

> Security while your deferred action is in effect and, for admissibility purposes, you are considered to be lawfully present in the United States during that time. Individuals granted deferred action are not precluded by federal law from establishing domicile in the U.S.
>
> Apart from the immigration laws, "lawful presence," "lawful status" and similar terms are used in various other federal and state laws. For information on how those laws affect individuals who receive a favorable exercise of prosecutorial discretion under DACA, please contact the appropriate federal, state or local authorities.

(ECF No. 65-1 at 7).

Federal law prohibits the possession of a firearm by "any person . . . who, being an alien, is illegally or unlawfully in the United States." 18 U.S.C. § 922(g)(5)(A). In *United States v. Latu*, 479 F.3d 1153 (9th Cir. 2007), Latu challenged his conviction under § 922(g)(5)(A) on the grounds that "he had filed a non-frivolous application for adjustment of status and was allowed to remain in the United States during the pendency of the application." *Id.* at 1155. The Court of Appeals adopted the definition of "illegally or unlawfully in the United States" set forth the applicable Bureau of Alcohol, Tobacco, and Firearms (ATF) regulation at 27 U.S.C. § 478.11(b). *Id.* at 1159. The Court stated "as the statute is silent as to the definition of 'illegally and unlawfully in the United States,' we defer to the ATF's interpretation." *Id.* at 1158. The Court further stated "This regulation, of course, does not necessarily foreclose Latu's argument that although he *was* in the United States, his presence once again became lawful when he applied for adjustment of status." *Id.* at 1159. The Court affirmed Latu's conviction concluding, "absent a statute preventing Latu's removability upon the filing of his application for adjustment status, we can envision no interpretation that renders Latu's presence anything other than 'illegal[] or unlawful[].'" *Id.* The Court affirmed defendant's conviction finding that "the filing of an application for adjustment of status did not legalize Latu's presence." *Id.*

In *United States v. Anaya-Acosta*, 629 F.3d 1091 (9th Cir. 2011), the Court of Appeals affirmed defendant's conviction under 18 U.S.C. § 922(g)(5)(A) on the grounds that "the issuance of a departure control order does not modify an alien's immigration status." *Id.* at 1093. The Court reaffirmed the application of 27 C.F.R. §

478.11 for the purposes of § 922(g)(5) stating,

> Because the statute itself is silent as to the meaning of 'illegally or unlawfully in the United States,' we defer to the [Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF")]'s interpretation. The regulation interpreting § 922(g)(5)(A) reads, in pertinent part, as follows: Alien illegally or unlawfully in the United States. Aliens who are unlawfully in the United States are not in valid immigrant, nonimmigrant or parole status. The term includes any alien — (a) Who unlawfully entered the United States without inspection and authorization by an immigration office and who has not been paroled into the United States . . .

*Id.* at 1094. (internal citations omitted). The Court stated that the issuance of a departure control order that required Anaya-Acosta to remain in the country until its revocation "does not modify an alien's immigration status and is not equivalent to being paroled into the United States." *Id.* at 1093. The Court found that "Anaya-Acosta was illegally in the country and remained so as a matter of law." *Id.* at 1094. The Court concluded that "there is no legal authority indicating that Anaya-Acosta's immigration status is affected by the departure control order . . . ." *Id.*

Subsequent to *Latu* and *Anaya-Acosta*, the Supreme Court declined deference to an ATF regulation interpreting § 922(a)(6) in *Abramski v. United States*, 134 S.Ct. 2259 (2014). Abramski challenged his § 922(a)(6) conviction for knowingly making a false statement about "any fact material to the lawfulness of the sale" of a firearm. 18 U.S.C. § 922(a)(6). Abramski was charged with falsely asserting that he was the actual transferee/buyer of a firearm when "according to the form's clear definition, he was not." *Id.* at 2265. Abramski asserted that his false statement was not material because he was "eligible anyway to own a gun." *Id.* at 2273. In support of his argument, Abramski argued that prior to 1995 the ATF took the view that a straw purchaser's misrepresentation counted as material only if the true buyer could not legally possess a gun. The Supreme Court rejected the argument stating,

> The critical point is that criminal laws are for courts, not for the Government, to construe. *See, e.g., United States v. Apel*, 571 U.S. ——, 134 S.Ct. 1144, 1151, 186 L.Ed.2d 75 (2014) ("[W]e have never held that the Government's reading of a criminal statute is entitled to any deference"). We think ATF's old position no more relevant than its current one—which is to say, not relevant at all. Whether the Government interprets a criminal statute too broadly (as it sometimes does) or too

- 5 -

narrowly (as the ATF used to in construing § 922(a)(6)), a court has an obligation to correct its error. Here, nothing suggests that Congress—the entity whose voice does matter—limited its prohibition of a straw purchaser's misrepresentation in the way Abramski proposes.

*Id.* at 2274.

In this case, the Court concludes that Defendant's acceptance into DACA announced by the Department of Homeland Security did not alter his immigration status or materially impact the determination whether he is "illegally or unlawfully in the United States" pursuant to § 922(g)(5)(A). As in *Abramski*, there is nothing suggesting that Congress intended to exclude aliens "illegally or unlawfully in the United States" accepted in the DACA Program from the statutory provision in § 922(g)(5)(A). *See Latu*, 479 F.3d at 1159 ("absent a statute preventing Latu's removability upon the filing of his application for adjustment status, we can envision no interpretation that renders Latu's presence anything other than 'illegal[] or unlawful[].'").

A statute is unconstitutionally vague on its face if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "Vague statutes are invalidated for three reasons: (1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of laws based on 'arbitrary and discriminatory enforcement' by government officers; and (3) to avoid any chilling effect on the exercise of First Amendment freedoms." *Humanitarian Law Project v. Mukasey*, 552 F.3d 916, 928 (9th Cir. 2009) (quoting *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir.1998)) (internal quotation marks omitted).

In this case, the provisions of DACA promising to defer removal and to authorize work did not confer lawful immigration status or create ambiguity as to the prohibitions of § 922(g)(5)(A). *See United States v. Arrieta*, 862 F.3d 512, 516 (5th Cir. 2017) (finding that § 922(g)(5)(A) applied to DACA recipient who continued to lack "lawful status"). The plain language of § 922(g)(5)(A) sets forth the intent of Congress to prohibit an alien illegally or unlawfully in the United States from the possession of a

firearm.  The Court finds that 18 U.S.C. § 922(g)(5)(A) provides clear notice to aliens without lawful status in the United States.

The rule of lenity is reserved "for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to the 'language and structure, legislative history and motivating policies' of the statute." *Moskal v. United States*, 498 U.S. 103, 108 (1990) (quoting *Bifulco v. United States*, 447 U.S. 381, 387 (1980)).  The decision of Congress to include illegal aliens within the categories of persons who are prohibited from possessing firearms is not subject to a reasonable doubt as to its intended scope based on issuance of the DACA federal executive order.  *But see United States v. Orellana*, 405 F.3d 360, 371 (5th Cir. 2005) (applying the rule of lenity and concluding that "we cannot say with certainty that Congress intended to criminalize the possession of firearms by aliens who have been granted temporary protected status.").

Defendant's motion to dismiss Count 2 (ECF No. 53-1) is denied.

**B. Preclude proceeding under an aiding and abetting theory (ECF No. 53-2)**

Defendants move the Court to preclude the Government from proceeding under an aiding and abetting theory on Count 1.  Defendants contend that aiding and abetting is not implied in the indictment and the citation to 18 U.S.C. § 2 does not render the indictment sufficient.  Defendants contend that the indictment fails to include the essential element that defendant had the specific intent to aid the principal in the commission of the offense.

Plaintiff United States contends that the intent of an aider and abettor is the same as the intent for the principal in the substantive offense.  Plaintiff United States asserts that the indictment includes a reference to 18 U.S.C. § 2 and that there is no legal requirement to allege any further element of the offense of aiding and abetting.

In the context of aider and abettor liability, there is a single crime that the defendant is charged with committing; he could commit that offense by directly performing illegal acts himself, or by aiding, abetting, counseling, commanding, inducing, or procuring the commission of the offense. Whichever, the defendant (if convicted) is liable as a principal. *See* 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."). Thus, unlike the mens rea for attempts, an

> aider and abettor's intent regarding the substantive offense is the same intent required for conviction as a principal. *See, e.g.*, [*United States v.*] *Gaskins*, 849 F.2d at [454,] 459 [(9th Cir. 2005)].

*United States v. Garcia*, 400 F.3d 816, 819 (9th Cir. 2005). In this case, the indictment sufficiently alleges that Defendants "knowingly" possessed a firearm. The mens rea for aiding and abetting is the same intent required for conviction as a principal. "Aiding and abetting is not a separate and distinct offense from the underlying substantive crime, but is a different theory of liability for the same offense." *Id*. at 820. The indictment properly charges aiding and abetting in Count 1.

Defendants' motion to preclude the Government from proceeding under an aiding and abetting theory on Count 1 (ECF No. 53-2) is denied.

**C. Bill of particulars (ECF No. 53-3)**

Defendants move the Court for an order requiring the Government to specify the manner in which the alleged possession of a firearm affected commerce and to describe with particularity the actions taken by Defendants which were tantamount to possessing an unregistered firearm. Plaintiff United States opposes the motion.

The purpose of a bill of particulars is to protect a defendant against a second prosecution for an inadequately described offense, and enable him to prepare an intelligent defense. *Duncan v. United States*, 392 F.2d 539, 540 (9th Cir. 1968). "Generally an indictment is sufficient if it sets forth the elements of the charged offense so as to ensure the right of the defendant not to be placed in double jeopardy and to be informed of the offense charged." *United States v. Woodruff*, 50 F.3d 673, 676 (9th Cir. 1995). Often, "[f]ull discovery will obviate the need for a bill of particulars." *United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983) (citing *United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979); *United States v. Clay*, 476 F.2d 1211, 1215 (9th Cir.1973)). A defendant is not entitled to know all the evidence the Government intends to produce, but is entitled to know the theory of the Government"s case. *Yeargain v. United States*, 314 F.2d 881, 882 (9th Cir. 1963). Granting or refusing to grant a bill of particulars is within the sound discretion of the trial court. *Wong Tai v.*

*United States*, 273 U.S. 77, 82 (1927); *see also United States v. Buckner*, 610 F.2d 570, 574 (9th Cir. 1979).

The indictment in this case provides a plain, concise, and definite statement of the essential facts constituting the crime with which Defendants have been charged and is adequate under Federal Rule of Criminal Procedure 7. The indictment provides a specific description of the firearm involved in both counts of the indictment, as well as the date on which Defendants allegedly possessed that firearm. Discovery has been provided pursuant to the Federal Rules of Criminal Procedure. The Court finds that the indictment is sufficient and a bill of particulars is not required.

Defendants' motion for a bill of particulars is denied.

**2) Motion to compel discovery and suppress gunshot residue (ECF No. 54)**

**A. Motion to compel discovery (ECF No. 54-1)**

Defendant Fierro-Morales moves for an order compelling discovery regarding selective enforcement and selective prosecution. Defendant asserts that his case was referred from state investigation to federal prosecution for the purpose and intent of discriminating against him based upon his alienage. Defendant contends that the Office of the United States Attorney "has charged almost no one with possession of an unregistered firearm or alien in possession of a firearm unless: (1) they have serious criminal history; (2) the case involves guns and drugs; (3) the case was initiated by federal law enforcement agency; or (4) the case involved machine guns." (ECF No. 54-1 at 4). Defendant submits a list of 183 cases from the Southern District of California using the ECF filing entry code which includes prosecutions for § 922(g)(5)(A) over the last five years, and information from a newspaper article regarding a San Diego man prosecuted by state law enforcement in March of 2018. Defendant contends that his case falls outside of the factors he identifies as underlying federal prosecutions for possession of an unregistered firearm or alien in possession of a firearm. Defendant asserts that his case was referred for federal prosecution in order to target immigrants and that a discriminatory purpose can be inferred from statements made by the President

of the United States reflecting an intent that federal enforcement officials target immigrants.

Plaintiff United States opposes the request for discovery on the grounds that Defendant has shown no evidence of discriminatory law enforcement intent or effect relating to alienage or immigration status. Plaintiff United States asserts that the Defendant's assertion that his case involves far less egregious conduct than other cases federally prosecuted is not supported by any credible evidence. Plaintiff United States contends that the decision to prosecute an individual apprehended speeding away from the scene of a shooting in a residential neighborhood in possession of an unregistered, short-barreled, sawed-off shotgun is a valid exercise of prosecutorial decision-making.

In *United States v. Turner*, the Court of Appeals stated:

> In order to be entitled to discovery to establish a defense of selective prosecution, a defendant cannot rely upon Federal Rule of Criminal Procedure 16(a)(1)(C). *United States v. Armstrong*, 517 U.S. 456, ——, 116 S.Ct. 1480, 1485, 134 L.Ed.2d 687 (1996). A defendant may, however, obtain discovery if he makes "the appropriate threshold showing." *Id*. The appropriate threshold showing is to be conducted against the "background presumption" that the Attorney General of the United States and United States Attorneys are properly discharging their official duties and not acting with a racial bias contrary to the commands of the Constitution. *Id*. at ——, 116 S.Ct. at 1486.

> To determine the appropriate threshold it is important to have in view what a successful defense of selective prosecution would establish. To succeed as a defense, the defendant "must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.' " *Id*. at 1487 (quoting *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985)). Both prongs must be demonstrated for the defense to succeed. "[A]wareness of consequences" is not the same as intent to discriminate. The kind of intent to be proved is that the government undertook a particular course of action "at least in part 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group." *Wayte*, 470 U.S. at 610, 105 S.Ct. at 1532.

> The threshold requirement to obtain discovery on the way to proving such a defense must relate to the defense to be proved. In *Armstrong* the Supreme Court held that the defendants must produce "some evidence that similarly situated defendants of other races could have been prosecuted, but were not." *Armstrong*, 517 U.S. at ——, 116 S.Ct. at 1488.

104 F.3d 1180, 1184 (9th Cir. 1997),

In this case, Defendants were arrested by San Diego police officers on September

10, 2017, at approximately 3:32 a.m. The officers identified and stopped a vehicle based upon a reasonable suspicion that the occupants were involved in illegally discharging a weapon. Defendant Nazario-Ramirez was the driver of the vehicle and Defendant Fierro-Morales was the front seat passenger. Subsequent to the stop, an officer saw two unexpended shotgun shells in plain view inside the center console cup-holder and a shotgun sticking out from under the vehicle's front passenger seat. Defendants were arrested by state authorities and later released on bail. Defendants were subsequently charged in Count 1 by federal authorities with possession of a weapon that should have been registered with the National Firearms Registration and Transfer Record. Defendant Fierro-Morales was subsequently charged in Count 2 with being an alien unlawfully in the United States in possession of a firearm.

The Court concludes that Defendant has not met his burden to provide evidence that similarly situated individuals of a different alienage were presented for prosecution to the United States Attorney and prosecution was declined. Defendant's assertion that his alleged actions do not meet the standards he believes were applied to other individuals federally prosecuted with an unregistered firearm does not demonstrate discriminatory purpose. In this case, the decision of the United States Attorney to prosecute this case falls within the proper duties of the United States Attorney Office and the "strong presumption of honest and constitutional behavior." *Armstrong*, 517 U.S. at 458. Defendant Nazario-Ramirez, a United States citizen, was referred for federal prosecution in Count 1 along with Defendant Fierro-Morales. Any decision to bring the charge in Count 2 against Defendant Fierro-Morales necessarily relied upon his immigration status. The lack of legal immigration status is an element of the offense in Count 2. There is no evidence in this record that Defendant Fierro-Morales was targeted for investigation or prosecution by law enforcement because of his alienage, or that similarly situated individuals of a different alienage were not charged. *See id*. at 457 (holding that defendant must produce "some evidence that similarly situated defendants of other races could have been prosecuted, but were not").

Defendant's motion for an order compelling discovery regarding selective enforcement and selective prosecution is denied.

**B. Motion to suppress gunshot residue evidence (ECF No. 54-2)**

Defendant Fierro-Morales moves to suppress gunshot residue evidence on the grounds that he did not consent to the gunshot residue test and the Government did not obtain a warrant. Plaintiff United States asserts that the gunshot residue test at the time of Defendant's arrest was not a search under the Fourth Amendment. In the alternative, Plaintiff United States asserts that the gunshot residue test falls into the exception to the warrant requirement for searches incident to arrests and that exigent circumstances justified performing the gunshot residue test without a warrant.

The Court held an evidentiary hearing on May 22, 2018. The Government presented the testimony of criminalist Steven Cordes and San Diego Police Officer Brendan Johanson. Cordes works in the trace section of the San Diego Police Department Forensic Crime Lab conducting testing, including gunshot residue analysis. Cordes testified that gunshot residue is not an adhesive and will start shedding as soon as the residue is deposited onto human hands or any living surface. Cordes testified that gunshot residue takes the form of "small, round metal particles that can be move removed from - by rubbing, washing, just normal attrition - normal putting your hands in your pockets, moving around." (ECF No. 83 at 9). Cordes testified that gunshot residue diminishes over time and that after six hours the results of a gunshot residue test are nonsignificant.[3]

Officer Johanson testified that Defendant was stopped on September 10, 2017 at approximately 3:30 a.m. Officer Johanson testified that Defendant was arrested and taken to the central substation. Officer Johanson testified that he used a gunshot residue kit to swab Defendant's hands at the station at approximately 5:30 a.m. Officer

---

[3] Defendant filed a motion to compel discovery to verify that Cordes was "competent to testify about gunshot residue generally." (ECF No. 77-1 at 2). The Court concludes that Cordes testified credibly based upon his education and experience and that further discovery was not required. Defendant's motion to compel discovery (ECF No. 77) is denied.

Johanson testified that he used a small disk to press lightly on the skin of Defendant's hands and placed the disc in a container. Officer Johanson testified that he was trained to collect gunshot residue evidence as soon as it was safe to do so because the evidence can diminish over time and people can deploy tactics to wash away the evidence. Officer Johanson testified that Defendant's hands had been bagged at the scene prior to his transport to the central substation. Officer Johanson testified that he was aware of the procedures for obtaining a warrant over the phone on weekends after work hours in case of an emergency.

Generally, a search conducted without a warrant violates the Fourth Amendment's prohibition against unreasonable searches and seizures. However, "the ultimate touchstone of the Fourth Amendment is reasonableness." *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). *Chimel v. California*, 395 U.S. 752 (1969) "stands in a long line of cases recognizing an exception to the warrant requirement when a search is incident to a valid arrest." *Cupp v. Murphy*, 412 U.S. 291, 295 (1973). In *Birchfield v. North Dakota*, the Supreme Court explained,

> [I]n *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), we elaborated on *Chimel*'s meaning. We noted that the search-incident-to-arrest rule actually comprises "two distinct propositions": "The first is that a search may be made of the person of the arrestee by virtue of the lawful arrest. The second is that a search may be made of the area within the control of the arrestee." 414 U.S., at 224, 94 S.Ct. 467. After a thorough review of the relevant common law history, we repudiated "case-by-case adjudication" of the question whether an arresting officer had the authority to carry out a search of the arrestee's person. *Id*., at 235, 94 S.Ct. 467. The permissibility of such searches, we held, does not depend on whether a search of a particular arrestee is likely to protect officer safety or evidence: "The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." *Ibid*. Instead, the mere "fact of the lawful arrest" justifies "a full search of the person." *Ibid*.

136 S. Ct. 2160, 2175-76 (2016).

In this case, Defendant does not assert that his arrest was not supported by adequate probable cause or that the collection of the gunshot residue evidence was not

17cr3096WQH

contemporaneous with his arrest. "Both the person and the property in his immediate possession may be searched at the station house." *United States v. Edwards*, 415 U.S. 800, 803 (1974). Based upon the negligible physical intrusion and the ready destructibility of the evidence, the Court concludes that the gunshot residue evidence was properly collected in the course of a search incident to a lawful arrest. *See Chimel*, 395 U.S. at 763 ("[I]t is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.").

In the alternative, considering all of the circumstances, exigent circumstances justified the limited intrusion necessary to collect the gunshot residue evidence from Defendant's hands without delaying to obtain a warrant. *See Missouri v. McNeely*, 569 U.S. 141, 150 (2013) ("[T]he fact-specific nature of the reasonableness inquiry . . . demands that we evaluate each case of alleged exigency based on its own facts and circumstances." (internal quotation marks and citations omitted)). In this case, the characteristics of the residue evidence, readily destructible and significantly diminishing over time, presented a compelling need for official action prior to the time by which Officer Johanson could have reasonably expected to secure a warrant.

Defendant's motion to suppress gunshot residue evidence is denied.

**3) Motion to dismiss Count 2 for violating the Second Amendment (ECF No. 56)**

Defendant Fierro-Morales moves the Court to dismiss Count 2 of the indictment on the grounds that 18 U.S.C. § 922(g)(5)(A), as applied to him and other beneficiaries of the DACA program, violates his rights under the Second Amendment to the United States Constitution. Defendant asserts that he has substantial connections to the United States which qualify him for constitutional protection of his right "to own and carry guns for personal use" as a DACA recipient. (ECF No. 56-1 at 2). Defendant asserts that he has a strong "claim to be a member of the national community, and consequently of 'the people'" who enjoy the protections of the Constitution set forth in *District of Columbia v. Heller*, 554 U.S. 570 (2008). *Id*. at 4. Defendant contends that the

prohibitions of § 922(g)(5)(A) cannot survive intermediate scrutiny as a reasonable restriction on the Second Amendment rights of DACA recipients.

Plaintiff United States contends that § 922(g)(5)(A) does not impermissibly restrict Defendant's right to bear arms under the Second Amendment. Plaintiff United States asserts that § 922(g)(5)(A) provides a reasonable restriction on any Second Amendment right that Defendant may possess because Defendant has no legal status in the United States and any deferral of removal under DACA is temporary.

A number of circuit courts have upheld the constitutionality of § 922(g)(5)(A) after concluding that the Second Amendment does not protect aliens without legal status in the United States. *See United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) ("[I]llegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection."); *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011) ("Whatever else the term means or includes, the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States . . . ."); *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) (per curiam) ("[T]he protections of the Second Amendment do not extend to aliens illegally present in this country.").

Other circuit courts have declined to hold that the Second Amendment does not protect unauthorized non-citizens, but have concluded that "§ 922(g)(5) does not impermissibly restrict [the] Second Amendment right to bear arms." *United States v. Meza-Rodriguez*, 798 F.3d 664, 673 (7th Cir. 2015); *see also United States v. Huitron-Guizar*, 678 F.3d 1164, 1168 (10th Cir. 2012) (declining to hold that the right to bear arms is categorically inapplicable to non-citizens but upholding the constitutionality of §922(g)(5)(A) under intermediate scrutiny).

In *Meza-Rodriguez*, the Court of Appeals for the Seventh Circuit upheld the constitutionality of § 922(g)(5) against a Second Amendment challenge. The Court of Appeals initially concluded that the phrase "the people," which is used in the First, Second, and Fourth Amendments, "has the same meaning" in all three Amendments.

798 F.3d at 670. The Court then applied the standard set forth in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), to determine whether Meza-Rodriguez was entitled to invoke the protections of the Second Amendment. *Id.*

In *Verdugo-Urquidez*, the Supreme Court stated that "'the people' protected by the Fourth Amendment, and by the First and Second Amendments, . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 494 U.S. at 265. In *Verdugo-Urquidez*, the Supreme Court stated that "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *Id.* at 271. Applying the standard in *Verdugo-Urquidez*, the Court in *Meza-Rodriguez* found that Meza-Rodriguez had developed substantial connections to the United States as a United States resident, but concluded that "Congress's interest in prohibiting persons who are difficult to track and who have an interest in eluding law enforcement is strong enough to support the conclusion that 18 U.S.C. § 922(g)(5) does not impermissibly restrict Meza-Rodriguez's Second Amendment right to bear arms." 798 F.3d at 673.

The decision of the Supreme Court in *Heller* provides reason to doubt whether an alien in the United States with no legal status is entitled to rely upon the protections of the Second Amendment to advance a right to own and carry a gun for personal use. In *Heller*, the Supreme Court stated that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible *citizens* to use arms in defense of hearth and home." 554 U.S. at 635 (emphasis added). However, the Supreme Court in *Heller* disclaimed any intention to set the limits of the Second Amendment. *See id.* at 635 ("But since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field . . . ."). Consequently, this Court assumes, without deciding, that "the people" protected by the Second and the Fourth Amendment may be read consistently, and that the right to bear

17cr3096WQH

arms is not categorically inapplicable to unauthorized non-citizens.[4]

In this case, as in *Meza-Rodriguez*, Defendant has "developed substantial connections with this country" as a United States resident, and may be eligible to "receive constitutional protections." *Verdugo-Urquidez*, 494 U.S. at 271. Assuming that the Second Amendment applies to a class of illegal aliens with substantial connections to the United States, the Court examines whether § 922(g)(5) would constitute a permissible restriction of this right.

This circuit uses a "two-step . . . inquiry" to determine whether a challenged law or regulation violates the Second Amendment. *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013). The two-step inquiry "reflects the Supreme Court's holding in *Heller* that, while the Second Amendment protects an individual right to keep and bear arms, the scope of that right is not unlimited." *Id.*

> In the first step, [courts] ask "whether the challenged law burdens conduct protected by the Second Amendment," *Chovan*, 735 F.3d at 1136, based on a "historical understanding of the scope of the [Second Amendment] right," *Heller*, 554 U.S. at 625, 128 S.Ct. 2783, or whether the challenged law falls within a "well-defined and narrowly limited" category of prohibitions "that have been historically unprotected," *Brown v. Entm't Merchants Ass'n*, [564] U.S. [791-92 ] . . . (2011).

*Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014). If a court determines that the challenged law does burden conduct protected by the Second Amendment, "the court then proceeds to the second step of the inquiry to determine the appropriate level of scrutiny to apply." *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016) (citing *Jackson*, 746 F.3d at 960), *cert. denied sub nom. Silvester v. Becerra*, 138 S. Ct. 945 (2018).

Because § 922(g)(5)(A) is a categorical ban on the possession of firearms and the record does not contain any evidence that illegal aliens have presumptively or historically been restricted from bearing arms, this Court proceeds to the second step

---

[4] Cases which conclude that *lawful permanent resident aliens* are protected by the Second Amendment are not relevant to this analysis. *See Fotoudis v. City and County of Honolulu*, 54 F. Supp. 3d 1136 (D. Hawaii 2014) and *Fletcher v. Haas*, 851 F. Supp. 2d 287 (D. Mass. 2012) (emphasis added).

of the inquiry to determine appropriate level of scrutiny to apply. *See Mahoney v. Sessions*, 871 F.3d 873, 878-80 (9th Cir. 2017) (proceeding to the second step because the employer policy resembled none of the presumptively lawful measures identified in *Heller* and the parties adduced no evidence that the policy fell outside the historical scope of the Second Amendment right to use a firearm for self-defense).

To ascertain the proper level of constitutional scrutiny to apply at step two, the Court must consider: "(1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right." *Silvester*, 843 F.3d at 821 (citing *Jackson*, 746 F.3d at 960-61). A restriction "that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny," while a restriction that "does not implicate a core Second Amendment right, or does not place a substantial burden on the Second Amendment right" warrants intermediate scrutiny. *Id.* (quoting *Jackson*, 746 F.3d at 961).

In this case, the severity of the burden imposed by § 922(g)(5)(A) is substantial, but § 922(g)(5)(A) does not implicate the core of the Second Amendment right because it applies to aliens in the United States illegally or unlawfully. "*Heller* tells us that the core of the Second Amendment is 'the right of law-abiding, responsible *citizens* to use arms in the defense of hearth and home.'" *Chovan*, 735 F.3d at 1138 (emphasis added). There is no indication that the framers of the Constitution or Justices in *Heller* intended to provide protection for the right to bear arms of non-citizens in the United States without any legal status. The Court concludes that intermediate scrutiny is the proper standard to apply to Defendant's claim that the prohibition in § 922(g)(5)(A) violates his Second Amendment rights. *See Meza-Rodriguez*, 798 F.3d at 672 (concluding that intermediate scrutiny is the proper standard to apply to defendant's claim that § 922(g)(5) violates the Second Amendment); *Huitron-Guizar*, 678 F.3d at 1169 (same); *see also Chovan*, 735 F.3d at 1138 (applying intermediate scrutiny to claim § 922(g)(9) violates the Second Amendment).

"In the context of Second Amendment challenges, intermediate scrutiny requires:

17cr3096WQH

'(1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective.' " *Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015) (quoting *Chovan*, 735 F.3d at 1139). Congress enacted the exclusions in § 922 in the Gun Control Act of 1968 to combat the increasing prevalence of crime in the United States and to prohibit the possession of firearms for certain identified individuals. *See* S.Rep. No. 90-1501, at 22 (1968) ("The ready availability, that is, the ease with which any person can anonymously acquire firearms (including criminals, juveniles without the consent of their parents or guardians, narcotic addicts, mental defectives, armed groups who would supplant duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest) is a matter of serious national concern."). In 1986, Congress amended the prohibited persons under § 922 to include an alien, "illegally or unlawfully in the United States." PL 99-308, May 19, 2986, 100 Stat 449 ("The Congress finds that – (1) the rights of citizens – (A) to keep and bear arms under the second amendment to the United States Constitution . . . require additional legislation to correct existing firearms statutes and enforcement policies."). Congress reaffirmed that "it is not the purpose of the act to place any undue or unnecessary restrictions or burdens on responsible law-abiding citizens. . . for lawful purposes." *Id.*

Congress has stated its intention unequivocally in § 922(g)(5)(A) to prohibit aliens without legal status in the United States from the possession of a firearm and to protect right of responsible law-abiding citizens to possess appropriate firearms for lawful purposes. *See Matthews v. Diaz*, 426 U.S. 67, 79-80 (1976) ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens."). The broad objectives of § 922(g) – promoting public safety and crime control – are consistent with the constitutional framework of the Second Amendment. *See Heller*, 554 U.S. at 625 ( stating that "weapons not typically possessed by law-abiding citizens for lawful purposes" are not protected by Second Amendment). Prohibiting the possession of firearms by an alien

in the United States with no legal status is a reasonable method for Congress to promote these important interests in crime control and public safety. Congress made no exception for aliens illegally in the United States with deferred deportation granted by the executive branch. The Court concludes that restricting gun possession of aliens illegally in the United States under § 922(g)(5)(A) survives the application of intermediate scrutiny under Second Amendment analysis.

Defendant's motion to dismiss the indictment on the grounds that the statute violated his rights under the Second Amendment is denied.

### 4) Motion to sever counts and discovery (ECF No. 68)

Defendant Fierro-Morales moves the Court to sever counts on the grounds that he could choose to offer testimony that could exonerate him as to Count 1 but would convict him on Count 2. Defendant further moves the Court for additional discovery materials regarding selective enforcement and selective prosecution. Plaintiff United States asserts that Defendant has not shown prejudice to outweigh the proper joinder of the claims in this case.

Rule 14 of the Federal Rules of Criminal Procedure provides in part "[i]f the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant . . ., the court may order separate trials of counts[.]" Fed. R. Crim. P. 14(a). Joinder is the rule rather than the exception. Thus, the party seeking severance bears a burden on appeal "to show that joinder was so manifestly prejudicial that it outweighed the dominant concern with judicial economy and compelled exercise of the court's discretion to sever." *United States v. Armstrong*, 621 F.2d 951, 954 (9th Cir. 1980). Where the defendant's argument for severance is based on his desire to testify about less than all of the charges, he "'must show that he has important testimony to give on some counts and a strong need to refrain from testifying on those he wants severed.' " *United States v. Dicesare*, 765 F.2d 890, 898 (9th Cir. 1985) (quoting *United States v. Nolan*, 700 F.2d 479, 483 (9th Cir.), cert. denied, 462 U.S. 1123 (1983)).

In this case, Defendant is charged with possession of an unregistered sawed-off

shotgun and alien in possession of the firearm. These offenses involve the same firearm and the same possession occurring on the same date. Joinder of the counts is proper. Defendant asserts that he "might testify as to key facts that would prove that he did not know that the length of the barrel was less than 18 inches." (ECF No. 68-1 at 5). Defendant asserts that testimony that he "had only held the gun for a short period of time would bolster his defense as to Count I, that same testimony would help convict him as to Count II." *Id.* The Court concludes that Defendant has not carried the burden to show that joinder is not proper in this case. Defendant's pleading stating that he "might testify" or "could choose to offer important testimony" is not sufficient to order severance at this stage in the proceedings. (ECF No. 68-1 at 4-5).

Defendant's motion to sever and to compel discovery are denied.[5]

IT IS HEREBY ORDERED that 1) the motion to dismiss Count 2, preclude proceeding under an aiding and abetting theory, and for a bill of particulars (ECF No. 53) are denied; 2) the motion to compel discovery and suppress gunshot residue (ECF No. 54) are denied; 3) the motion to dismiss Count 2 for violation of the Second Amendment (ECF No. 56) is denied; 4) motion to sever counts and discovery (ECF No. 68) is denied; and 5) Defendant's motion to compel discovery (ECF No. 77) is denied.

IT IS FURTHER ORDERED that the motions to join filed by Defendant Alex Nazario-Ramirez (ECF No. 59 and 91) are granted.

DATED: June 26, 2018

WILLIAM Q. HAYES
United States District Judge

---

[5] Defendant's request for discovery related to selective enforcement has been addressed.

17cr3096WQH